John L. Denning & Company, Inc., a corporation v. Commissioner.
John L. Denning & Co. v. Commissioner
Docket No. 13174.
United States Tax Court
1948 Tax Ct. Memo LEXIS 7; 7 T.C.M. (CCH) 980; T.C.M. (RIA) 48277; December 29, 1948
*7 Petitioner's controlling stockholder, acting through a power of attorney for his son, then in the Armed Forces, entered into an agreement with other members of his family purporting to form a partnership to carry on business similar to that of petitioner. The controlling stockholder allotted between petitioner and the partnership merchandise bought in the field and otherwise participated in handling the partnership's business. Held, respondent did not err in including the partnership's income in the income of petitioner. Petitioner's inventory of broomcorn was computed on the "last in, first out" basis. Prior to 1945 the increase in the inventory of broomcorn on hand at the end of a fiscal year was valued at the average cost of all purchased in the year. In the fiscal year ended February 28, 1945, the price paid varied in different districts in which broomcorn was purchased. Petitioner valued the increase in the closing inventory at the average cost of all broomcorn on hand according to the average prices paid during the year in the districts in which it originated. Held, respondent did not err in valuing the increase upon the average cost of all broomcorn purchased in the year. *8 Held, respondent did not err in adding freight, hauling charges and commissions to the cost of broomcorn for inventory purposes. George Siefkin, Esq., 608 Fourth National Bank Bldg., Wichita, Kan., for the petitioner. George E. Gibson, Esq., for the respondent. ARNOLD Memorandum Findings of Fact and Opinion ARNOLD, Judge: The respondent determined deficiencies in petitioner's taxes as foollows: Year ended
Year ended
February
February
29, 1944
28, 1945
Income tax
$ 675.58
$ 344.71
Declared value excess
profits tax
14,420.05
13,415.02
Excess profits tax
84,500.23
77,503.88
The petitioner alleges that the respondent erred in taxing to the petitioner the income of Denning Broom Corn Company, a partnership, and in overvaluing the inventory of petitioner for February 28, 1945. Findings of Fact Petitioner is a corporation organized under the laws of the State of Louisiana and admitted to transact business in the State of Kansas. Its principal place of business is in Wichita, Kansas. Its tax returns were prepared on the accrual basis covering fiscal years commencing March 1. Its returns for the fiscal years ended February 29, 1944 and February 28, 1945 were filed with the collector of internal revenue at Wichita, Kansas. The *10 petitioner is in the business of buying and selling broomcorn and broom supplies. John L. Denning was the president and principal stockholder of petitioner during the taxable years. E. M. Denning, hereinafter sometimes referred to as Effie, is the wife of John L. Denning. John L. Denning, Jr., and Edwana Denning Collins are son and daughter of John L. Denning by a former marriage. In the taxable years the son was serving overseas in the Armed Forces of the United States and his father held a power of attorney to act for him in all matters. On October 1, 1943, the petitioner had outstanding 1,299 shares of its common stock of which John L. Denning held 753, Effie Denning, 16; John L. Denning, Jr., 196; and Edwana Denning Collins, three. There were 20 other stockholders, owning an aggregate of 331 shares. On October 1, 1943, an agreement was signed by Effie, Edwana, and John L. Denning, Sr., as attorney-in-fact for his son, to form a partnership to be known as Denning Broom Corn Company, for convenience hereinafter referred to as the partnership. Its stated purpose was "buying, selling, trading, and dealing in broom corn and similar products." The capital was to consist of $25,000 *11 to be contributed equally by the three named as partners who were to share profits and losses equally. Effie was designated as manager. Edwana Collins was a housewife and was caring for two small children and took no active part whatever in the business of the partnership. The son was in the Armed Forces of the United States, overseas, and took no active part in the organization of the partnership or its affairs during the taxable years. Effie Denning had experience in the broomcorn business through her employment by petitioner in New Orleans and Wichita. She arranged with Robert Adams, who had been for many years, and continued to be, an employee of the petitioner, that he assume the responsibility of buying and selling broomcorn on the partnership's account. She delegated to him the active management of the partnership's affairs and authority to engage any other necessary employees on behalf of the partnership. Thereafter she concerned herself little with the details of the business and though she went frequently to the office, she did no regular work in connection with the business. Adams drew a yearly salary of $3,600 from the partnership, as well as a salary in excess of that *12 amount from the corporation. John L. Denning, Sr., drew $50 per month from the partnership funds in addition to a salary from the corporation. The petitioner corporation and the partnership had their offices in the same building. The corporation made a charge to the partnership for general overhead expenses and rental for space used, as well as charging the partnership for warehousing of broomcorn. Connected with the petitioner were eleven corporations, all engaged in various phases of the broomcorn business. Seven of these corporations were engaged in selling broomcorn, three in buying and selling, and one in warehousing operations. One was a wholly owned subsidiary of petitioner and petitioner was the majority stockholder in the others. The partnership inventory of broomcorn reflects that on the dates indicated it held in its name broomcorn in the following amounts: Physical inventory on hand, Dec.
31, 1943
2,008,440 lbs.
Inventory, February 29, 1944
584,527 lbs.
Physical inventory on hand, Dec.
31, 1944
573,621 lbs.
Inventory, February 28, 1945
180,184 lbs.
The partnership borrowed funds for the financing of purchases of broomcorn in its name. The *13 loans were arranged for by John L. Denning, Sr. During the taxable periods the balances of the notes payable account varied from about $3,500 to about $210,900. Some employees of the corporation were also on the payroll of the partnership. Other employees were on the payroll of the partnership alone. Employment tax returns were filed on behalf of the partnership on account of such employees. During the period from October, 1943 to December, 1944 there were deposited to the credit of the partnership, monies to the extent of $1,530,277.90 and approximately $1,500,000 was withdrawn from such account. Separate books of account were maintained in the name of the partnership. In its 1943 and 1944 partnership returns income and deductions were reported and claimed as follows: Period Oct. 15, 1943
to Dec. 31, 1943
1944
Sales of broomcorn
$359,650.29
$880,753.77
Less Cost of Sales: Inventory, beginning of period
$256,305.80
Purchases
$549,504.68
580,668.55
Total
$549,504.68
$836,974.35
Less: Inventory end of period
256,305.80
293,198.88
46,169.23
790,805.12
Gross profit
$ 66,451.41
$ 89,948.65
Operating, general and administrative expense
7,382.68
40,200.84
Net profit from operations
$ 59,068.73
$ 49,747.81
Additional income: Interest earned
61.13
632.90
Net income
$ 59,129.86
$ 50,380.71
Net income distributed as follows: Effie Denning - 1/3 plus salary
$ 19,843.28
$ 17,593.57
Edwana D. Collins - 1/3
19,643.29
16,393.57
John L. Denning, Jr. - 1/3
19,643.29
16,393.57
$ 59,129.86
$ 50,380.71
*14 For the fiscal period ended February 29, 1944, petitioner reported a net income of $30,472.05 and for the fiscal year ended February 28, 1945, a net income of $47,628.11. John L. Denning has been president of petitioner since its organization and has had 36 years' experience in the broomcorn business. In addition to his work in connection with petitioner's business, he drew drafts on the partnership accounts, arranged for financing at banks for both the partnership and the corporation, signed some correspondence in the partnership's name as "manager" thereof, and decided whether the broomcorn purchased would belong to the partnership or corporation, basing his decision on their respective bank balances. The broomcorn was purchased from growers by agents. The partnership and the petitioner bought through the same agents and sold to the same customers. In 1944 certain shipments of broomcorn were made in which a carload lot was shipped to a customer and half was billed by the corporation and half by the partnership, the customer being charged for freight in excess of carload rates while the petitioner and the partnership paid only the carload rate of freight. The Office of Price *15 Administration investigated these shipments and brought an action against petitioner and members of the partnership, alleging that this practice was in violation of maximum price regulations. Although the trial court found the shipments did not violate the regulations, the Circuit Court of Appeals for the Tenth Circuit reversed and ordered judgment against the defendants ( John L. Denning & Co., Inc., et al. v. Fleming, 160 Fed. (2d) 697). Petitioner valued its inventories of broomcorn on the "last in, first out" method, authorized under section 22 (d) of the Code. Prior to the fiscal year ended February 28, 1945, petitioner determined the "average unit cost" of its broomcorn by dividing the aggregate cost of all broomcorn purchased during a year by the number of pounds purchased. The purchases of broomcorn by petitioner during the fiscal year ended February 28, 1945, amounted to 17,998,986 pounds. The aggregate cost was $2,218,004.43. This figure includes the amounts of $160,950.54 expended during the year for hauling, loading and commissions of buyers, $53,534.87 expended for inbound freight and $40,989.31 expended for hauling. The average cost was $123.23 per thousand *16 pounds. On February 29, 1944, the petitioner's inventory contained 1,138,761 pounds of broomcorn and the partnership had in its name 584,527 pounds, a total of 1,723,288 pounds. The cost of this total inventory, computed on the "last in, first out" method, was $151,258.71. On February 28, 1945, the petitioner had on hand in its inventory 3,871,243 pounds of broomcorn and the partnership inventory contained 180,184 pounds, a total of 4,051,427 pounds. Respondent computed the value of the opening and closing inventories on the "last in, first out" basis, as follows: Price
Quantity
per
pounds
1,000 lbs.
Amount
On hand 6-30-42
661,806
$ 39.86
$ 26,379.59
Excess 6-30-43
421,220
87.47
36,843.10
Excess 2-29-44
640,262
137.50
88,036.02
Inventory 2-29-44
1,723,288
$151,258.71
Excess 2-28-45
2,328,139
123.23
286,896.57
Inventory 2-28-45
4,051,427
$438,155.28 The value of the excess, or increase in quantity, for each year or period was determined from the average cost per thousand pounds of all broomcorn purchased during that year or period. Broomcorn varies in quality. Shed-cured broomcorn is of better quality and commands *17 a higher price than field-cured broomcorn. Shed-cured broomcorn from the district of Lindsay, Oklahoma, is regarded by some as the finest broomcorn grown. In the year ended February 28, 1945, petitioner purchased broomcorn from six areas including the Lindsay district. The cost of that purchased from the Lindsay district average $145.52 per thousand pounds. Petitioner's records enabled it to identify broomcorn purchased in the various areas, and the cost thereof. Petitioner computed the average cost per thousand pounds of broomcorn purchased during the taxable year by districts, as follows: District in which
Average cost
broomcorn purchased
Pounds
Net cost
per 1,000 lbs.
Texas
4,952,358
$ 589,191.95
$118.97
Lindsay, Okla.
2,269,279
330,223.45
145.52
Western Okla.
1,557,434
146,674.72
94.18
Colorado
5,379,541
528,752.81
98.29
Kansas
1,968,688
195,035.08
99.02
New Mexico
1,864,807
170,633.33
91.50
17,993,107
$1,960,511.34
The actual broomcorn held by petitioner on February 28, 1945, was predominantly cheaper merchandise and all but 29,952 pounds out of 3,871,243 pounds were purchased in areas at costs averaging below $100 per *18 thousand pounds. Petitioner classified this broomcorn according to the district in which it originated, computed its value on the basis of the average cost of that purchased in such district during the year and found the average cost of the broomcorn on hand, as follows: District in which
Pounds in
broomcorn purchased
inventory
Average cost
Total
Texas
None
$118.97
Lindsay
29,952
145.52
$ 4,358.62
Western Okla.
396,506
94.18
37,342.94
Colorado
1,096,288
98.29
107,754.15
Kansas
289,272
99.02
28,643.71
New Mexico
2,053,346
91.50
187,881.16
Total
3,865,364
$ 94.68
$365,980.58 Petitioner valued the increase in its inventory of February 28, 1945, over that of February 29, 1944 at $94.68 per thousand pounds. Petitioner acquired title to purchase broomcorn while it was in the fields. After the purchase petitioner paid charges for hauling, loading and freight to petitioner's warehouse. Prior to the year in controversy the petitioner had paid its employees on a salary basis for services performed in locating and buying broomcorn. In the year involved there was a scarcity of buyers and for the purpose of increasing their volume petitioner *19 paid its buyers on a commission basis. The business in form carried on by the partnership from October 1, 1943 to February 28, 1945, was in reality and substance the business of petitioner. The average unit cost of broomcorn purchased by petitioner during the fiscal year ended February 28, 1945, was $123.23. The value of petitioner's broomcorn inventory on February 28, 1945, was $438,155.28. The respondent did not err in determining average cost on the basis of all purchases made during the year and did not err in including commissions, hauling, loading and freight charges in the cost for inventory purposes. Opinion The respondent added to petitioner's gross income the income reported by the partnership. The notice of deficiency explains the adjustment: "A large part of the business of the corporation was diverted by the majority stockholder and manager of the taxpayer corporation, acting as manager of the partnership, to the partnership. Under the provisions of section 45 of the Internal Revenue Code it is held that the business diverted to the partnership was the business of the taxpayer corporation and taxable to it." Contending that respondent *20 erred, the petitioner explains that Effie Denning had some money of her own and desired to go into some business for herself. She decided to venture in the broomcorn business in which she had had some experience. Edwana Collins desired to join in this venture and Denning and his wife loaned her the necessary funds. Denning invested his son's money for the son's benefit, acting through his power of attorney. The agreement designated Effie as the manager of the partnership. She engaged Robert Adams, an experienced employee of the corporation, to conduct the actual business of the partnership. The business accounts of the partnership were separately kept and audited and the profits of the venture divided among the designated partners. Effie testified that her husband was consulted on matters of partnership business but his advice was not always taken. Petitioner alleges that at no time did John L. Denning, Sr., dominate or control the partnership or oversee its affairs. The respondent contends that the income purportedly that of the partnership was, in reality, that of the corporation. If this is so, it is taxable to the corporation under section 22 (a). Standard Oil Co, 43 B.T.A. 973, *21 and cases there cited. It is elementary that taxpayers are free to adopt such organization of their business affairs as they may choose, and also that the Government is not required to recognize a taxpayer's election if a form adopted is unreal or a sham. Higgins v. Smith, 308 U.S. 473; Commissioner v. Tower, 327 U.S. 280; Lusthaus v. Commissioner, 327 U.S. 293. The respondent points out that it has already been judicially determined that the family partnership here involved was but the alter ego of the petitioner and that its existence as a separate entity should be disregarded in order to prevent the circumvention of legislative enactments. An action was brought by the Administrator, Office of Price Administration, against this petitioner and members of this partnership for violations of the maximum price regulations governing the sale of broomcorn. On appeal, the Circuit Court of Appeals for the Tenth Circuit reversed the District Court, John L. Denning & Co., Inc., et al. v. Fleming, 160 Fed. (2d) 697. The Circuit Court stated, in part: "The corporation had been in business many years. John L. Denning was the dominant force *22 in the corporation. He owned approximately 70 to 80 per cent of its stock, and he and his family owned approximately 85 per cent of its stock. It is also clear that he was the moving force in the formation of the partnership, consisting of his wife, his son and his daughter. He arranged credit for the partnership at the bank. * * * "While he testified that his wife was the managing partner, he wrote letters for the partnership which he signed as manager of the partnership. He was authorized to and did draw drafts on the partnership account. Employees of the corporation were also employees of the partnership. Both organizations had the same listed telephone number. They used the same postoffice box. They had the same customers. Denning offered broomcorn to his customers on condition that the broomcorn would be purchased from both the corporation and the partnership. This broomcorn was then shipped in the same car and invoiced approximately one-half in the name of each, so that each invoice would be for less than 14,000 pounds. Denning testified himself that 'Looking at this thing from an outside man's viewpoint it might look as though we used these two companies as a device to defeat *23 the price regulations.' He testified that there were other ways in which the same thing could be accomplished but that they probably would not look so good. In other words, he adopted the device which looked best to him - a family partnership which he controlled, dominated and operated as part of the corporation. "Under these facts the conclusion is inescapable that the partnership was but the alter ego of the corporation and the separateness of the two should be disregarded and these split shipments should be treated as single shipments of more than 14,000 pounds. Such arrangements as this have been universally disapproved for the purpose of circumventing the effect of legislative enactments. The trial court should have treated these shipments as single shipments and rendered judgment for the Administrator accordingly. * * *" Notwithstanding that partnership books were kept independent of the corporation, we think the evidence shows that the business conducted by it was part and parcel of the corporation's business and that it was a device whereby substantial earnings of the corporation were siphoned off for the benefit of members of the family of petitioner's controlling stockholder. *24 Two of the alleged partners took no active part whatever in the business, and Mrs. Denning turned over the active operations to Adams, who was, and continued to be, an employee of the corporation. The capital investment of Mrs. Collins was loaned to her by John L. and E. M. Denning. John L. Denning took the initiative in investing his son's money on the son's account and, so far as it appears, without consulting the son. Denning, Sr. and Adams drew compensation from both the corporation and the partnership. The business transacted by them in the name of the petitioner and of the partnership was in the same commodity and of the same general character. Denning was president and manager of the petitioner. He also exercised controlling authority over the business handled in the name of the partnership. He drew checks on the partnership bank account in transacting business on its account. He arranged at the bank for loans of funds in the partnership name as well as for financing petitioner's business. He signed some correspondence on behalf of the partnership as "manager" thereof. It is obvious that the partnership was not in competition with the corporation although both were buying *25 broomcorn through the same agents and selling it to the same customers, and that Denning had enough control of the activities of the partnership to divide the business between them as he chose. He testified that when a purchase of broomcorn was made he determined whether it would belong to the corporation or the partnership, deciding this on the basis of their respective bank balances, so that at the end of the season each would be supplied to the extent of its finances. If the partnership were actually conducting an independent business, buying and selling on its own account, Denning would have had no right to allot part of the purchased broomcorn to the partnership and part to the petitioner. In our opinion, these facts show that, for all practical purposes, there was control of the partnership's business by the corporation through its controlling stockholder. Since the formation of this partnership involved no real economic change and the controlling stockholder of petitioner remained in control of all the business transacted in the name of either concern, it is reasonable to conclude that one of the purposes of the formation of the partnership was to shift some of the income *26 of the petitioner to members of the family of its controlling stockholder with a view to reducing taxes. It was satisfactory to Denning to have the members of his family make some of the profits that otherwise would be realized by, and taxed to, the corporation. See Durwood v. Commissioner, 159 Fed. (2d) 400. Transactions involving members of families calculated to reduce family taxes should always be subjected to special scrutiny. Commissioner v. Tower, supra. The petitioner argues that the corporation carried on all the business it was able to finance and therefore could not have realized any of the income of the business carried on in the name of the partnership. This argument falls in face of the fact that the partnership had no outside source of revenue or means of obtaining credit. Denning arranged for the bank loans to finance the business carried on in the name of both, the capital originally put up by the partners was in part loaned by Denning and the balance supplied by members of his family, who were stockholders in the corporation and the profits of the business allocated to the partnership soon were in excess of the original investments. The *27 capital of $25,000 was but a minor factor in the financing of this business as the borrowings Denning arranged for in the name of the partnership amounted to as much as $210,900 in March, 1944. The business attributed to the partnership could as well have been financed in petitioner's name. The petitioner argues, further, that even if Denning financed the partnership and controlled it, this would not constitute financing or control by the corporation. Denning organized the corporation and was its controlling stockholder and president during its existence. Until October, 1943 his dealings in broomcorn were conducted entirely through this corporation or others controlled by it. The broomcorn which he allotted to the partnership was bought by field agents of the corporation and was sold to customers of the corporation. Under the circumstances, the partnership clearly had no separate and independent business of its own and, for tax purposes, should be disregarded. Gregory v. Helvering, 293 U.S. 465; Helvering v. Gordon, 87 Fed. (2d) 663. The partnership's business belonged to the corporation. The petitioner cites Seminole Flavor Co., 4 T.C. 1215, *28 in which we held the existence of a partnership separate and distinct from a corporation owned by the partners should not be ignored. There the partnership took over the merchandising of a product manufactured by the corporation and the corporation ceased its activity in the business carried on by the partners. Also Buffalo Meter Co., 10 T.C. 83, in which we recognized a partnership of the two stockholders of a corporation, the partnership handling manufacturing and selling while the corporation operated a foundry. Also Ross v. Commissioner, 129 Fed. (2d) 310, reversing 43 B.T.A. 1155, where the Circuit Court held that a partnership engaged in buying and selling was separate and distinct from a corporation owned by some of the partners which was engaged in conducting auction sales on commission. In the cited cases there was a distinct business operation conducted in the name of the partnership, which was different from that carried on by the corporation and was not in competition with the corporation's business. Here the partnership had no such separate business. The business transacted in its name was actually allotted to it by Denning out of *29 the petitioner's business. The case of John L. Denning & Co., Inc., et al. v. Fleming, supra, involved the same corporation and the same partnership as here, and their business relationship was the same in both cases. The determination of the Circuit Court that "the conclusion is inescapable that the partnership was but the alter ego of the corporation and the separateness of the two should be disregarded" and that "such arrangements as this have been universally disapproved for the purpose of circumventing the effect of legislative enactments" equally applies here. We think the respondent did not err in taxing the income of the partnership to the petitioner. Petitioner alleges that respondent erred in including commissions paid buyers and amounts paid for hauling, loading, and freight after petitioner acquired title to broomcorn in the field, as part of the cost of broomcorn purchased during the year instead of treating such items as deductible expenses, and in computing the "average cost" of the increase in the closing inventory by the average cost of all broomcorn purchased in the year instead of basing it upon the cost of separate types, grades and quality of *30 the broomcorn on hand at the end of the year. The Treasury Regulations provide that the cost of merchandise purchased includes transportation or other necessary charges incurred in acquiring possession of the goods. (Regulations 111, section 29.22 (c)-3.) The expenditures for freight, hauling, loading and commissions were for acquiring possession of the broomcorn and are a part of the direct costs. Respondent's method is supported by the weight of accounting authority. See May, Stern & Co., 20 B.T.A. 241, affirmed 56 Fed. (2d) 1034. Although petitioner argues that the commissions paid buyers in the taxable year were in substitution for salaries and are deductible as compensation paid for personal services actually rendered, the payments were none the less a part of the cost of acquiring the broomcorn and should be included therein. Similar treatment is accorded payments for direct labor in manufacturing goods for sale. The petitioner computed its inventories under the elective "last in, first out" method authorized by section 22 (d) of the Internal Revenue Code. This method permits a taxpayer to treat the goods on hand at the end *31 of a taxable year first, as those included in the opening inventory of the year to the extent thereof, and second, as those acquired during the year. Where, as here, there is an increase in the quantity on hand in the closing inventory as compared with the opening inventory, the increase may be valued in one of the methods described in the applicable regulations, [1] and the method adopted by a taxpayer with the approval of the Commissioner must be adhered to in all subsequent taxable years. Petitioner had adopted and used in prior years the method of the average unit cost of all broomcorn purchased during the year. Prior to February 28, 1945, petitioner's inventories did not classify broomcorn in different grades or according to the geographical districts in which it was purchased. *32 The petitioner's inventory of February 28, 1945, showed the quantity of broomcorn on hand to be 4,051,427 pounds, an increase of 2,328,139 pounds over the inventory of February 29, 1944. Respondent valued the increase at $123.23 per 1,000 pounds, the average cost of all purchased in the fiscal year. The petitioner contends that this method does not correctly reflect income, as it results in overvaluing the closing inventory. The petitioner, in the fiscal year involved, bought for the first time a substantial quantity of broomcorn of cheaper grade and sold practically all the higher grade broocorn so that the closing inventory contained principally merchandise of cheaper grade, all but about 30,000 pounds out of some 4,000,000 pounds having an average unit cost of less than $100. In an effort to have the closing inventory reflect the true situation, petitioner valued its closing inventory increase in the following manner: the total purchases in the year were listed by the districts in which the broomcorn was purchased and an average unit cost determined for each district; the actual quantity on hand at the end of the year was listed according to the districts of origin; the average *33 unit cost for each district was applied to determine the value of the quantity on hand from that district; and from these quantities and valuations the average unit cost of the broomcorn actually on hand was found; this average was applied to the inventory increase for the year to determine the cost thereof. The effect of the petitioner's method is to obtain an inventory of the merchandise actually on hand, valued at the average prices paid in the year in the several districts and to secure an average unit cost, not of all broomcorn purchased throughout the taxable year, but of the broomcorn remaining on hand at the end of the year. This is contrary to the applicable regulations on the subject. The petitioner's classification of its broomcorn by districts was a departure from the method followed in prior years. Its computation was made on a different basis from that of the opening inventory and, hence, was not consistent therewith. Consistency in the calculations of opening and closing inventories is a fundamental requirement of any inventory method. Respondent's method is consistent with that used by petitioner in prior years and meets the requirements of the regulations. The *34 respondent's method of computing the value of the closing inventory is sustained. Decision will be entered for the respondent. Footnotes
1. Reg. 111, Sec. 29.22(d)-2. Requirements incident to adoption and use of elective method. - Except as otherwise provided in section 29.22 (d)-1 with respect to raw material computations, and with respect to retail inventory computations, the adoption and use of the elective inventory method is, by section 22(d) and regulations thereunder, made subject to the following requirements: * * *
(4) Goods of the specified type on hand as of the close of the taxable year in excess of what were in hand as of the beginning of the taxable year shall be included in the closing inventory, regardless of identification with specific invoices and regardless of specific cost accounting records, at costs determined pursuant to the provisions of Rule (A) or Rule (B) hereof, dependent upon the character of the transactions in which the taxpayer is engaged; Rule (A). In the case of a taxpayer engaged in the purchase and sale of merchandise, such as a retail grocer or druggist, or engaged in the initial production of merchandise and its sale without processing, such as a miner selling his ore output without smelting or refining, such costs shall be determined - (a) By reference to the actual cost of the goods most recently purchased or produced; (b) By reference to the actual cost of the goods purchased or produced during the taxable year in the order of acquisition; (c) By application of an average unit cost equal to the aggregate cost of all of the goods purchased or produced throughout the taxable year divided by the total number of units so purchased or produced, the goods reflected in such inventory increase being considered for the purposes of section 22(d) as having been acquired all at the same time; or (d) Pursuant to any other proper method which, in the opinion of the Commissioner, clearly reflects income. Whichever of the several methods of valuing the inventory increase is adopted by the taxpayer and approved by the Commissioner shall be consistently adhered to in all subsequent taxable years so long as the elective inventory method is used by the taxpayer; * * *↩